THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AEROCARE MEDICAL TRANSPORT SYSTEM, INC., f/k/a R&M AVIATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> ADVANCED HOMECARE MANAGEMENT INC., d/b/a ENCOMPASS HOME HEALTH GROUP BENEFIT PLAN, <br><br> Defendant. | No. 20 C 1735 <br><br> Judge Virginia M. Kendall |

## MEMORANDUM OPINION & ORDER

Plaintiff Aerocare Medical Transport ("Aerocare") brought suit against Defendant Advanced Homecare Management, Inc., d/b/a Encompass Home Health Group Benefit Plan ("Encompass") for breach of contract. (Dkt. 35 at 2). Specifically, Aerocare alleges that Encompass reneged on its agreement to reimburse Aerocare in the amount of $295,600 for air ambulance services provided to an individual covered by Encompass's health benefit plan. The parties filed cross-motions arguing that the contract's plain language demands entry of summary judgment. (*E.g.*, Dkt. 32-1 at 6; Dkt. 35 at 5). For the following reasons, Aerocare's motion [34] is granted, and Encompass's motion [32] is denied.

## BACKGROUND

Aerocare provides domestic and international air ambulance transportation services. (Dkt. 40 ¶ 3). On October 21, 2017, Aerocare transported Sean Rea via air ambulance from Phoenix, Arizona to Chicago, Illinois for a liver transplant. (*Id.* ¶ 8). Rea's physician deemed it medically necessary for him to travel to Chicago for the procedure and further determined that "medical

1

transport" was required given Rea's "critical condition." (Dkt. 37-7). The cost of Aerocare's air ambulance transportation amounted to $369,500. (Dkt. 40 ¶ 8).

Rea was a beneficiary of a self-funded health benefit plan sponsored by Encompass (the "Plan"). (*Id.* ¶¶ 4, 5; Dkt. 39 ¶ 6). The Plan offers benefits for medically necessary air ambulance services, including by out-of-network providers such as Aerocare. (Dkt. 40 ¶¶ 9 (further explaining that the Plan pays 70%, 80%, or 90% of ambulance charges depending on the level of coverage an insured has purchased), 15 (noting that Aerocare is considered an out-of-network provider); *see also* Dkt. 41 at 36 ("This Plan provides coverage for [air ambulance transportation] if services are authorized by a Physician . . . and are necessary for the treatment of an illness or injury.")). Aerocare filed a claim with Encompass seeking reimbursement for the air ambulance provided to Rea (the "Rea Claim"). (Dkt. 40 ¶ 8).

Third-party UMR administers health benefits under the Plan and makes medical necessity determinations for Encompass. (*Id.* ¶ 6 (also noting that AllMed is a team operating within UMR)). Encompass authorized UMR to process Aerocare's claim. (*Id.* ¶¶ 16, 18–20). UMR ultimately determined that Rea's air ambulance transport was medically necessary and covered by the Plan. (*Id.* ¶¶ 18–19). Julie Bennett, a claims arbitrator employed by UMR, was assigned as a third-party administrator to negotiate a settlement of Aerocare's charges. (*Id.* ¶¶ 20 (further explaining that Bennett's role at UMR was to "review claims for potential negotiations and complete negotiations with providers to secure a 'single case agreement' "), 25). To calculate an offer in response to the Rea Claim, Bennett referred to the terms of the Plan and consulted with her direct supervisor. (*Id.* ¶¶ 21–22, 25–27).

On September 20, 2019, Bennett contacted Aerocare by letter purporting to "negotiate an allowance of $295,600.00" for the Rea Claim (the "Agreement"). (Dkt. 41 at 13 (terms of the

2

Agreement further noting that "[t]his will be the accepted allowance in full"); Dkt. 39 ¶¶ 1–2; Dkt. 40 ¶ 24). In bold text, the Agreement explained that it "**is subject to benefit determinations that are made in accordance with the provisions of the benefit plan at the time services are rendered as the benefit plan supersedes all documents.**" (Dkt. 41 at 13 (emphasis in original)). The Agreement specified that the Plan would prevail "[i]n the event . . . [it] restrict[ed] the amount of benefits allowed for a covered service [e.g., air ambulance transportation] below the amount agreed to by the parties in this Agreement." (*Id.*). In addition, the Agreement set forth that Aerocare must "not balance bill [Rea] any difference between the negotiated allowance and the charges." (*Id.*). Bennett never asserted additional reservations or qualifications to the offer put forth in the Agreement. (Dkt. 40 ¶ 28). Bennett anticipated that if Aerocare accepted these terms, it would receive payment for the full amount offered. (*Id.* ¶ 27 (further noting that Bennett was not aware of any provisions in the Plan that would have provided for a different amount of payment)).

Bennett also communicated directly with Lacina Satteson, who worked in Aerocare's billing department, concerning the offer. (Dkt. 32-1 at 11; Dkt. 39 ¶ 12; Dkt. 40 ¶ 28). Satteson and Bennett frame their communications about the Rea Claim as a "negotiation." (*See* Dkt. 37-1 at 33:16–20 (Satteson testifying that **Bennett was "looking to negotiate** for [$]295,600" when she contacted Aerocare, and that Bennett faxed her a negotiation document (emphasis added)); Dkt. 37-4 at 48:14–49:9 (Bennett **affirming that she negotiated with Satteson**); Dkt. 37-5 at 28:15–24 (Bennett testifying that the Plan "allow[s] for negotiations" and affirming that **"those negotiations actually took place in this case between [Bennett] and [Satteson]"** (emphasis added)), 29:18–30:2 (Bennett affirming that she "negotiated" the claim); Dkt. 41 at 13 ("This letter is to **negotiate** an allowance of $295,600.00 for [the Rea Claim]." (emphasis added))). Aerocare

3

and Encompass also appear to recognize the communication between Bennett and Satteson as a negotiation. (Dkt. 32-1 at 1 (Encompass explaining that "[t]he contract at issue is a **letter . . . offering to negotiate a reimbursement** (allowance) of $295,600." (emphasis added)); Dkt. 34 at 6–7 (Aerocare explaining that its "bill for transporting Rea was assigned to [Bennett] to **negotiate payment**," and that Bennett "**negotiated a settlement** . . . with knowledge of the terms of the Encompass Plan." (emphasis added))).

On September 20, 2019, Satteson accepted UMR's offer in writing on Aerocare's behalf. (Dkt. 40 ¶ 29). However, instead of $295,600, Aerocare only received payment of $16,646.82. (Dkt. 39 ¶ 11; Dkt. 40 ¶ 30). Satteson testified that in her fifteen years of experience with medical billing, including work opposite UMR, "when they say a negotiated allowance of 295, that is basically a promise to pay $295,600." (*Id.* ¶ 29 (citing Satteson's further testimony that she had never observed an insurance company "basically come back and say they're not agreeing [to pay the amount offered] after [an agreement was] signed")). Similarly, Bennett testified that she could not recall another circumstance when a claim she negotiated was not funded. (*Id.* ¶ 32). Aerocare ultimately brought this action for breach of contract as Rea's assignee. (*Id.* ¶ 4).

## **LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). Summary judgment "requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The parties genuinely dispute a material fact when "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). *See also Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.") (internal citations omitted).

## DISCUSSION

"The elements of a claim for breach of contract are (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 786 (7th Cir. 2015) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 1st Dist. 2004)). Under Illinois law, the Court's goal in construing a contract is to effectuate the parties' intent. *Empress Casino Joliet Corp. v. W.E. O'Neil Const. Co.*, 68 N.E.3d 856, 869 (Ill. App. Ct. 1st Dist. 2016) (citing *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011)). *See also, e.g.*, *Salaita v. Kennedy*, 118 F. Supp. 3d 1068, 1077 (N.D. Ill. 2015) (quoting *Allen v. Cedar Real Estate Grp., LLP*, 236 F.3d 374, 381 (7th Cir. 2001). To achieve this goal, the Court first examines the plain language of the contract. *Empress Casino*, 68 N.E.3d at 869 (citing *Thompson*, 241 Ill. 2d at 441). *See also Camico Mut. Ins. Co. v. Citizens Bank*, 474 F.3d 989, 992–93 (7th Cir. 2007) (citing *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). If the words in the contract are clear and unambiguous, courts give them their plain, ordinary, and popular meaning. *Empress Casino*, 68 N.E.3d at 869 (citing *Thompson*, 241 Ill. 2d at 441). *See also Camico Mut. Ins. Co.*, 474 F.3d at 992–93 (explaining that Illinois courts follow the "four corners rule," directing that a written agreement "must be presumed to speak the intention

5

of the parties who signed it") (citations omitted); *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 479 (1998) ("The terms of an agreement . . . should be generally enforced as they appear, and those terms will control the rights of the parties.") (citations omitted). Mere disagreement between the parties concerning a provision's meaning does not render its language ambiguous. *Empress Casino*, 68 N.E.3d at 869.

The parties agree that the Agreement constituted a valid contract. (Dkt. 39 ¶ 1 (setting forth undisputed fact that "[t]he basis for the Breach of Contract claim brought by the Plaintiff is the letter dated September 20, 2019 between AllMed and Aero[c]are."); *see also* Dkt. 32-1 at 1 ("The contract at issue is a letter sent by AllMed (agent of Encompass) and directed to Aero[c]are on September 20, 2019 offering to negotiate a reimbursement (allowance) of $295,600.")). Their dispute concerns whether Encompass breached the contract by reneging its offer to pay $295,600 for the Rea Claim, and instead paying Aerocare a reduced sum of $16,646.82. (*See, e.g.*, Dkt. 32-1 at 5 ("The parties do not dispute the existence of a valid and enforceable contract but rather dispute its meaning.")).

The Agreement expressly contemplates that the $295,600 offered by UMR *might* be reduced if the Plan placed a restriction on that value. (*See* Dkt. 41 at 13). In particular, the Agreement sets forth that it is "subject to benefit determinations that are made in accordance with the provisions of the [Plan]" and that the Plan "supersedes all documents." (*Id.*). It clarifies that "[i]n the event [the Plan] restricts the amount of benefits allowed . . . below the amount agreed to by the parties in this Agreement [$295,600], the terms of the [Plan] will prevail." (*Id.*). UMR's proposal was thus subject to limitations set forth in the Plan *if* any such limitations applied.

Encompass argues that this language broadly "anticipates an adjusted payment amount," and that "an alternative methodology for payment of the out of network service supersedes the

6

stated maximum allowance of $295,[6]00." (Dkt. 42 at 7–8). In other words, Encompass maintains that UMR's $295,600 offer was limited to $16,646.82 by the Plan's superseding terms governing out-of-network claims. (Dkt. 32-1 at 8 (citing Dkt. 32-2 ¶¶ 8–11)). In support of its position, Encompass cites the following provision of the Plan:

> Reimbursement for Covered Expenses[1] received from Non-Network Physicians or health care facilities[2] are determined based on one of the following:
>
> [1] **Fee(s) that are negotiated with the Physician or facility;**
>
> [2] If fees have **not** been negotiated:
> [a] 110 percent of the published rates allowed by the Centers for Medicare and Medicaid Services (CMS) for the same or similar service within the geographic market […]

(Dkt. 32-2 at 34 (emphasis added)). Referencing provision 2(a) set forth above, Encompass explains that the Rea Claim was paid at the Plan's out-of-network rate, which covers "80% of 110% of the Medicare fee schedule," and that payment at this superseding reduced rate was contemplated by the terms of the contract. (Dkt. 32-2 ¶¶ 8, 10; *see also* Dkt. 32-1 at 2 ("The benefit plan provided coverage for air and ground transportation but paid 80% of the Medicare fee schedule on those [out-of-network services]. . . . Aero[c]are now seeks to retroactively nullify the contract it agreed to."); Dkt. 44 at 4 (arguing same)).

However, Encompass's interpretation of the Plan is at odds with its plain language. The cited terms plainly state that reimbursement rates are determined **either** (1) through fee negotiations between Encompass and a claimant, **or** (2) where fees have **not** been negotiated, through calculations based on Medicare rates. (Dkt. 32-2 at 34). Here, UMR acted on Encompass's behalf to negotiate the Rea Claim with Aerocare. The first sentence of UMR's letter to Aerocare states: "**This letter is to negotiate an allowance of $295,600.00** for [the Rea Claim]."

---

[1] Medically necessary air ambulance transportation is a covered expense per the terms of the Plan. (Dkt. 41 at 36).
[2] Aerocare is considered an out-of-network provider under the Plan. (Dkt. 40 ¶ 15).

7

(Dkt. 41 at 13 (emphasis added)). The letter Agreement goes on to state that Aerocare must "not balance bill [Rea] any difference between the **negotiated allowance** [of $295,600] and the charges." (*Id.* (emphasis added)). The parties do not ultimately dispute that a negotiation took place to resolve the Rea Claim. (*See, e.g.*, Dkt. 32-1 at 1 (Encompass explaining that the Agreement set forth a negotiated reimbursement for the Rea Claim); Dkt. 34 at 6–7 (Aerocare explaining that Bennett negotiated a settlement of the Rea Claim); Dkt. 37-1 at 33:16–20 (Satteson testifying that Bennett was "looking to negotiate for [$]295,600" when she contacted Aerocare); Dkt. 37-5 at 28:15–24 (Bennett testifying that "negotiations actually took place in this case between [Bennett] and [Satteson]")). Because Encompass determined a reimbursement rate for the Rea Claim through negotiations with Aerocare, Section 1 controls the contract between the parties. Encompass's reliance on Section 2(a) is untenable because it does not allow Encompass to renegotiate or otherwise impose alternate terms to the Agreement once it has engaged in fee negotiations.

The Plan also explains the process by which Encompass calculates health benefit reimbursements. (*See* Dkt. 37-3 at 7–8). These provisions further establish that the negotiated rate was binding on the parties. The Plan sets forth the following:

> **Claims for covered benefits are paid according to** [1] an established fee schedule, [2] **a negotiated rate for certain services**, <u>or</u> [3] as a percentage of the Usual and Customary fees. . . . charged by health care providers in the same geographical area . . . for the same services. . . .
>
> On occasion, UMR will negotiate a payment rate with a provider for a particular covered service . . . . **The Negotiated Rate is what the Plan will pay to the provider,** minus any Co-pay, Deductible, Plan Participation rate or penalties that the Covered Person is responsible for paying."

(*Id.* at 7–8 (emphasis added)). The Plan unequivocally states that Encompass "will pay" rates negotiated with claimant-providers. Thus, because Encompass authorized UMR to negotiate

8

reimbursement for the Rea Claim, Encompass was obligated to pay the parties' agreed-upon fee under the terms of its Plan.

In sum, although the Plan might have superseded the Agreement if a conflict arose, (Dkt. 41 at 13 ("In the event [the Plan] restricts the amount of benefits allowed . . . the terms of the [Plan] will prevail.")), Encompass fails to identify any such conflict rendering the Agreement obsolete. Instead, it inexplicably argues that the Medicare fee schedule applied to the Rea Claim. (Dkt. 32-1 at 8; Dkt. 39 ¶ 8; Dkt. 42 at 8). Encompass's argument is eviscerated by the sole provision of the Plan cited in support of this position, which clearly obligates Encompass to pay the fee negotiated by UMR. (Dkt. 32-1 at 8 (citing Dkt. 32-2 at 34 (explaining that reimbursement claims are settled through **either** fee negotiations **or** calculations involving the Medicare fee schedule))). The Agreement required Encompass to pay Aerocare $295,600 in accordance with the negotiated rate. Encompass's failure to do so breached its contractual obligation to Aerocare.[3]

## CONCLUSION

Aerocare's Motion for Summary Judgment [34] is granted, and Encompass's Motion for Summary Judgment [32] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: March 29, 2022

---

[3] Because the language of the operative documents plainly supports a finding of breach of contract, the Court does not address Aerocare's secondary arguments based on waiver or mistake, (Dkt. 34 at 6–9), nor requirements under ERISA (*id.* at 9–11).

9